Paul Edward Murry was indicted for the capital offense of murdering one Mary Pearl McCord, by shooting her with a pistol, while she was on active duty as a police officer for the City of Montgomery and was attempting to arrest Murry in violation of § 13A-5-40 (a)(5), Code of Alabama, 1975.
The jury found the appellant "guilty of the capital offense as charged in the indictment." *Page 55 
Following a separate sentencing hearing, the jury recommended the trial judge "fix punishment at life imprisonment without parole."
The trial judge ordered a pre-sentence report and set another sentencing hearing. After the trial judge independently weighed the aggravating and mitigating circumstances applicable in this case, he rejected the jury's recommended sentence and sentenced the appellant to death.[1]
The first witness for the State was K.L. Johns, a police officer with the Montgomery Police Department. On January 5, 1982, at approximately 6:00 P.M., he and his partner were on patrol and heard over the police radio that an officer had been shot. They proceeded to Pauline and Traction Avenues and upon their arrival, saw two cars parked next to each other. One of the vehicles was a tan Malibu which appeared to them to be an unmarked police car. The tan vehicle was parked in the middle of the street facing north on Traction Avenue and the doors on both sides were open. A black and red Ford was parked along side the Malibu.
After Johns parked his patrol car, he went to the passenger side of the tan vehicle and found Officer Tony Burks sitting on the ground, wounded. Burks told Johns to "help Mary, help Mary." (R. 11). Johns then went to the driver's side of the vehicle and saw Officer Mary McCord sitting on the rocker panel with her head on the seat. He removed McCord from the car, laid her on the ground and put his hat underneath her head. At this point, McCord was still breathing and had a pulse, but her chest was covered with blood and she was not responsive.
Shortly thereafter, several other police units, the paramedics and Mayor Emory Folmar arrived at the scene. Burks told the officers he believed the suspect had gone to a certain house on Traction Avenue and Johns was instructed to stake out the front porch of that house. A few minutes later, Johns saw a black male whom he identified as the appellant walk up to the Mayor and say something like, "I did it; I killed her; you know, I shot her." (R. 15). He distinctly remembered the appellant say "I shot 'em." (R. 24). The appellant was then taken into custody.
Captain G.E. Murphy went to Traction Avenue after receiving a 1033 emergency traffic transmission and arrived there a few minutes after Johns. When Murphy arrived, he saw a patrol car, an unmarked detective vehicle and two persons lying on the ground. He proceeded to the passenger side of the tan vehicle and found Burks who instructed him to go see about Mary.
Murphy went to McCord and placed a jacket over her. McCord asked Murphy "to please don't let her die." (R. 32). Murphy then called the paramedics and stayed with her until they arrived. Shortly before the paramedics got to the scene, the Mayor arrived. Soon thereafter, the appellant walked up to the Mayor with his hands raised and said "I did it, Mayor; I shot 'em. . . . I swear I did it." (R. 34). The appellant was then handcuffed and turned over to Sergeant Albert.
Lisa Wiggins testified that on January 5, 1982, she got off work at Shoney's around 5:15 p.m. Her husband and a friend picked her up and the three proceeded to Traction Avenue to buy some marijuana.
They arrived there at approximately 5:30 or 5:45 p.m. and parked in a yard where several other cars were parked. There were several people standing around and her husband and friend got out of the car.
Soon thereafter, a beige car with two antennas on the trunk passed by and "everybody said there goes the heat." (R. 41). Her husband and friend got back in the car while everyone else went into the house. She then saw the vehicle's brakelights come on and they decided to leave because they thought the vehicle might be turning around. *Page 56 
Wiggins testified she did not see anyone selling marijuana on the street at this time, but she had on previous occasions.
As the three were leaving Traction Avenue, they heard noises that sounded like gun shots but her husband told her it was just firecrackers. They went to her mother's house, listened to the radio and learned that a woman police officer had been shot.
Wiggins said they did not get in touch with the police, but the police contacted them after hearing about them from someone else.
Ralph Connor, an investigator with the Montgomery Police Department was instructed to proceed to Baptist Hospital on the evening of January 5, 1982. He and his partner arrived at the hospital at the same time as the ambulance transporting the wounded officers. Connor went into the emergency room with Officer McCord and was present when she was pronounced dead at 6:40 p.m. by Dr. Moorehouse.
Connor remained in custody of the body until it was transported to the City Morgue and was present during the coroner's examination.
He then took custody of her personal belongings and her revolver and later turned them over to Lonnie Harden of the Department of Forensic Sciences.
When Investigators L.H. Brown and Hamner arrived at the scene, they took custody of the appellant from Sergeant Albert and were instructed to take him to headquarters. The appellant was placed in the patrol car and Hamner read him his Miranda
rights.
The appellant said he knew his constitutional rights, stated he would be willing to answer questions and did not wish to have a lawyer at this time. Brown testified that no threats, promises, coercion or inducements were made to the appellant in an attempt to encourage him to make a statement.
The following testimony was given by Brown concerning the conversation between the appellant and himself during the trip to headquarters:
 "A. I asked him what his name was, and he advised me it was Paul Edward Murry. And he told me he worked for the City Sanitation Department.
"Q. All right, sir. And did he say anything else?
 "A. I asked him what had happened on Traction Avenue, and he told me that he had shot two people; that he thought they were trying to rob him.
 "Q. All right, sir. And did he say anything else at this time?
 "A. I asked him if he knew they were police officers, and he said no, that he wouldn't have done it if he had known they were.
"Q. And did he say anything else to you?
"A. Not that I recall." (R. 63).
When they arrived at headquarters, the appellant was taken to the Robbery-Homicide Division and was again advised of hisMiranda rights by Hamner. The appellant stated he thought he had been shot. Brown removed some of the appellant's clothing and saw a wound but was unable to determine if such was a gunshot wound. The paramedics were called and they said the wound appeared to have been caused by a gunshot and they wished to take him to the hospital to be x-rayed.
Prior to the appellant being transported to the hospital, Brown swabbed the appellant's hands with a gun residue kit to see if he had fired a weapon recently. During this time the appellant made the following statement to Brown:
 "A. During the time I was swabbing his hands, I asked him how he came to be shot with a small caliber weapon, and he stated that he had had a .22 in his right front pocket, and when he was approached by the black male and the black female, that he pulled his gun out, or attempted to pull it out, and it went off shooting himself. At this time, he stated that the black male told him to throw the gun in the ditch, which he did. Then he said he turned around and jumped the *Page 57 
black male and took his gun away from him and shot both of them." (R. 65-66).
Even though the appellant claimed he thought he was being robbed, he never stated what was taken from him. The appellant also said he only fired one shot before he threw his gun (a .22) in the ditch.
Investigators Ingram and Billingsley then took the appellant to the hospital.
Investigator Stan Ingram was called to headquarters sometime after 6:00 P.M. on January 5, 1982. He was present when the appellant made the statement while Brown swabbed his hands and Ingram's testimony concerning that statement was basically the same as Brown's.
Sergeant Billingsley, Ingram and Officer Ward of the Sheriff's Department took the appellant to the hospital and on the way there, the appellant, after being advised again of hisMiranda rights and without any threats, hopes, promises or inducements, made the following statement:
 "INVESTIGATOR INGRAM: This is Investigator Ingram, Montgomery Police Department. Today's date is 1-5-82. The time is 7:46 P.M. The place will be in a police vehicle enroute from Police Headquarters to Baptist Hospital. Occupants of the vehicle will be myself, Investigator S.W. Ingram, Sergeant Danny Billingsley, Montgomery Police Department, and Investigator Ward with the Montgomery County Sheriff's Department, and Paul Murry.
 "This taped statement will be in regards to the shooting of Police Officers Mary McCord and Tony Burks.
 "Paul, do you understand that you are being investigated in the shooting of these two police officers?
"THE DEFENDANT: Yeah, I do. Yeah.
"INVESTIGATOR INGRAM: Yes, you do?
"THE WITNESS: Right.
 "INVESTIGATOR INGRAM: Okay, I am fixing to read you your Miranda rights. Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in Court, that you can talk to a lawyer first, and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop answering at anytime.
"Do you understand your rights?
"THE DEFENDANT: I understand. Yes, I understand.
 "INVESTIGATOR INGRAM: Okay Paul, let's go back to earlier this afternoon. In your own words, if you would, tell me what happened in your involvement with the police officers.
 "THE DEFENDANT: Well, when I — I ain't didn't recognize hisself as a police officer. And, you know, like I said, told the officer, well, you know, people been robbing peoples up there. And the way they jumped out, you know, they didn't even say — all he had to say was police officer — I'm a police officer and you're under arrest. He didn't — and I would have did anything he said. But he didn't. So he grabbed me, put his pistol beside my neck, that's what he did. You know, so I pulled my pistol after I shot in my hip trying to get it out. I had my pistol in my pocket. I was trying to get it. And then the lady, whoever she was, I don't know, she said, well, I'm going to get help. So she went and got help. So, I don't know what happened because didn't nobody shoot. I shot in the air, and said get back, get back, and didn't nobody ever say they wasn't no police officer. And then I called somebody. I said y'all, y'all, come here, man, they're trying to rob me. Like that, you know, I said.
 "INVESTIGATOR INGRAM: Paul, let me interrupt you here. You need to slow down a little bit in your speech, and talk a little bit more clearly, okay? So let's try it again. Start from beginning. Just slow down and talk slower. *Page 58 
 "THE DEFENDANT: I drove up. I came from home. I just had carried my old lady something home for her to cook. She sent me to the store. So I came up there. I got out of the car. A car was coming down the street, so I came around by the trunk of the car. So when I came around the car, they stopped. And one of them said, put your hands up. So I looked and didn't nobody said nothing about no policeman. I said, hey man, I ain't got nothing. You know, like that. They said, put your hands up. So at this time, see, I grabbed a gun I had, you know, and he put his gun beside my head. He didn't say nothing that he was no policeman or nothing or nobody. Then I grabbed the gun. I was holding his gun, you see, and I had my gun. I said drop the gun, man. I said, drop the gun. I say, I don't want no trouble. I say, drop the gun. And he wouldn't drop the gun. So, you know, he throwed me, pushed me back, and I dropped my pistol, you know, like I had shot. I just kept shooting in the air trying to get somebody through the door for somebody to get out there and help me, you know. I said, Paul, I say, come help me man, come help me, somebody is trying to rob me, you know. And ain't nobody recognized no police officer. Man this is how it happened. That's all I remember. I mean, shoot . ..
 "INVESTIGATOR INGRAM: At what location did this happen, Paul?
"THE DEFENDANT: It was on Traction Avenue.
 "INVESTIGATOR INGRAM: Do you know the address on Traction Avenue?
 "THE DEFENDANT: It wasn't no address. I parked by the old field right there.
"INVESTIGATOR INGRAM: You parked where?
"THE DEFENDANT: By a field.
 "INVESTIGATOR INGRAM: By a field on Traction Avenue?
"THE DEFENDANT: Yeah.
 "INVESTIGATOR INGRAM: Did you have any dope in your possession, Paul?
 "THE DEFENDANT: No, I ain't have none. I smoked dope, but I ain't have none.
 "INVESTIGATOR INGRAM: You didn't have nothing illegal on you at the time the officers came?
 "THE DEFENDANT: Well, you say, like, you know I wasn't supposed to be carrying no pistol, yeah. That's the only thing.
 "INVESTIGATOR INGRAM: Okay, Paul, when the two officers came to you, how were they dressed?
"THE DEFENDANT: Street clothes.
 "INVESTIGATOR INGRAM: Did you recognize the vehicle as a police vehicle?
 "THE DEFENDANT: Nope. Nope. It wasn't marked. Wasn't no marks on it at all.
 "INVESTIGATOR INGRAM: How many shots did you fire, Paul?
 "THE DEFENDANT: I don't know, I emptied my gun because I shot all mine up in the air. I never shot at nobody. I told her to back up. She kept right on going. I could have got killed myself. That's what I'm doing, I'm thinking about that now.
 "INVESTIGATOR INGRAM: You say you emptied your gun into the air?
 "THE DEFENDANT: I kept shooting into the air. Kept shooting in the air. I just kept shooting in the air. He had — he had — had his gun — had his hand, his gun under my arm, you know, holding with my hand.
 "INVESTIGATOR INGRAM: He had his gun on you while you were shooting up in the air?
 "THE DEFENDANT: Uh-uh, I had his gun. I had his arm. I had his gun in this arm. Like that.
 "INVESTIGATOR INGRAM: All right. So you were holding his gun and arm while you were firing up in the air?
 "THE DEFENDANT: Yeah. I was trying to get somebody to the door. I didn't want to shoot nobody. No, I don't want to shoot nobody. Then what had happened, I don't know, he lost the gun and then we wrestled over the gun. You *Page 59 
know, I dropped my gun. And we were wrestling on the ground.
 "INVESTIGATOR INGRAM: Did you ever obtain possession of his revolver?
"THE DEFENDANT: Yeah. Yeah.
 "INVESTIGATOR INGRAM: Did you ever fire his revolver?
 "THE DEFENDANT: I would rather see somebody now; I really do. Let me see a lawyer or something, man. Let me see my mama or something.
 "INVESTIGATOR INGRAM: You don't want to answer any more questions?
 "THE DEFENDANT: Cause I don't know what is happening, man. I better not answer. I don't know what happened. I don't know if I'm going to get out now, or what.
 "INVESTIGATOR INGRAM: You don't know if you fired his gun?
 "THE DEFENDANT: I better ask somebody can I answer that, man; I don't know.
 "INVESTIGATOR INGRAM: This is Investigator Ingram. This will be the end of this particular tape. The time will be 7:55 P.M. Date 1-5-82.
 "End of tape recording played for the Court and jury.)
 "THE COURT: Let the Record reflect that we are now taking these aids back up from the jury." (R. 81-88)
Upon their arrival at the hospital, the appellant was treated and then returned to police headquarters. Ingram obtained the appellant's clothes and turned them over to Corporal Gantt, the evidence technician.
Dr. Thomas Gilchrist, a pathologist for the Department of Forensic Sciences performed the autopsy on Mary McCord. From an external examination of McCord, he located a bullet wound above the left collarbone. He conducted an internal examination and discovered the bullet had severed two major veins and a major artery before it lodged in the right lung.
Dr. Gilchrist removed the bullet and gave it to Lonnie Harden along with McCord's jacket and shirt which he described as civilian clothing. In his opinion, Dr. Gilchrist stated that McCord died of a gunshot wound to the chest.
John Taylor identified photographs of the deceased as his daughter, Mary McCord.
George Wyatt Gantt, an evidence technician with the Montgomery Police Department was called to Traction Avenue on January 5, 1982. When he arrived at 6:30 P.M., the scene had already been secured. He noticed two vehicles and a revolver and some cartridges lying within the secured area. He immediately took photographs of the crime scene and began to search for evidence.
Gantt found Burks' Smith and Wesson .357 caliber revolver. He examined the chamber and there were two spent cartridges and two that had been fired inside the cylinder of the revolver. Four live .357 cartridges were found on the ground.
A .22 revolver was found and when Gantt examined the chamber, he discovered six fired .22 cartridges. A pill bottle containing some pills was also found at the crime scene. The revolver and the pill bottle were turned over to Lonnie Harden.
On January 6, 1982, a search warrant was issued and a search was conducted of the other vehicle (the red Ford) at the crime scene which was identified as belonging to the appellant. The search was conducted at the city morgue.
Before the admission into evidence of any items found inside the vehicle, the court held a hearing outside the presence of the jury and determined there was sufficient probable cause for the issuance of the warrant. Several items were found within the car, including some cigarette rolling papers and a manilla envelope (found inside of a shirt located in the vehicle) which contained a greenish brown leafy substance. He turned the envelope over to Allen Adair at the Department of Forensic Sciences.
Gantt testified he received certain items of clothing which were identified as belonging to Burks and the appellant which he *Page 60 
sent to the Department of Forensic Sciences.
Lonnie Ray Harden, a Firearms and Toolmark Coordinator with the Department of Forensic Sciences testified he received several items of evidence and that he conducted various examinations of those items.
One of the items he received was a .38 special revolver with six cartridges. This was identified as McCord's gun. After his examination, Harden determined this pistol had not been fired because it had been recently cleaned.
Harden conducted certain tests on a .357 caliber magnum revolver and four .357 caliber magnum cartridges found at the scene. He determined that the expended cartridges found at the scene were fired from the .357 magnum revolver, which was Burks' gun.
Harden was given a bullet taken from McCord's body and a .22 caliber revolver, which was identified as belonging to the appellant. He conducted certain tests on the two items and concluded the bullet taken from McCord's body had been fired through the appellant's pistol.
Harden examined certain items worn by Burks on January 5, 1982. He believed the holes in Burks' ammunition pouch and handcuff carrier were caused by bullets. Gunpowder residue was found around a hole in the right rear of Burks' vest which indicated to Harden that the gun was fired from two inches away. Gunpowder residue was also found on the overcoat belonging to the appellant. Harden testified the residue pattern indicated the gun was fired within four inches of the coat and was not consistent with the appellant firing the gun above his head.
Tony Burks was McCord's partner on January 5, 1982. The two reported for work at 4:30 P.M., and following a staff meeting, went to eat dinner. Burks said they were both dressed in civilian clothing. Burks was driving a beige Chevrolet unmarked police vehicle and they proceeded to the Peddler's Inn. When they arrived, they decided not to stop because there were three police vehicles already there and it's against department policy to have more than three officers eating at one place. Instead, they went to get gas at the City Lot.
McCord had been curious about Traction Avenue and Burks decided he would take her there and familiarize her with the area by showing her the houses from which narcotics were sold.
They arrived at Traction Avenue around 5:45 or 6:00 P.M. and proceeded north on it at 10-15 m.p.h. As they were driving down the street, they saw several cars parked in a yard and several black males standing beside the cars. When they passed the house, everyone scattered so they did not stop.
Further down the street, they saw another black male standing behind the trunk of a vehicle motioning them to stop. The black male (who Burks identified as the appellant) was holding several manilla envelopes in his hand which are similar to those Burks had seen used to store marijuana for sale.
Burks drove past the appellant and then backed up to the vehicle by which he was standing. Both Burks and McCord got out of their vehicle. McCord told the appellant he was under arrest for possession and said, "I can't believe you're trying to sell police drugs." (R. 235).
When Burks reached the rear of the vehicle, he saw McCord and the appellant with their guns out pointed at each other. At this time, the appellant did not have the manilla envelopes in his hand. Burks drew his .357 magnum and the appellant said if he (Burks) tried to shoot him, he (the appellant would shoot her (McCord) first. Burks then identified himself as Investigator Burks and stated he would have to take him to jail.
McCord started moving and the appellant, with his gun focused on her, moved with her. At some point, Burks grabbed the appellant's right wrist and a shot was fired. *Page 61 
The two began tussling and several shots were fired. Burks identified himself numerous times and never heard the appellant say he was being robbed. He yelled to McCord to shoot but he thought that she didn't shoot since the two men were going around in circles and she probably couldn't get a good aim.
Burks was unable to fire his own gun because the appellant grabbed the cylinder of his gun. The gun did fire once when the appellant regripped the pistol and at some point, Burks was shot in the wrist.
McCord was backing up during this time and Burks heard a scream come from her direction. Burks testified that he could not say the appellant aimed at McCord.
The appellant kept telling Burks he was going to take him to the woods, so Burks tripped himself and the appellant and then they fell to the ground. Burks got up but was shot in the back as he was running to the police car to get a shotgun.
The appellant ran toward a house and then returned a short time later and said, "MF, you're not dead yet? Or, you ain't dead yet?" (R. 208). He then dropped Burks' gun at his feet and ran back to the house.
Burks began to crawl to the police vehicle and before he reached it, he saw a black male standing over him. He begged the man to call for help on the radio, but "somebody said, `don't nobody call the police'" (R. 226) and the man just walked away.
When he got to the passenger side of the vehicle, he saw McCord on the driver's side, but she would not respond to him. He called for help and then waited until aid arrived.
Allen Adair, criminalist with the Department of Forensic Sciences testified he examined the contents of a manilla envelope taken from the appellant's jacket pocket. The green leafy substance found inside the envelope was tested and Adair concluded it was marijuana.
Adair also examined the contents of a pill bottle which was found at the crime scene. Contained within the bottle were three valium tablets and five phenobarbitol tablets (both controlled substances). Other pills found inside the bottle were determined not to be controlled substances.
At this point, the State rested. The only witness for the defense was the appellant.
The appellant testified that he was employed by the city Sanitation Department on January 5, 1982. He got off work at 3:30 and went to Newtown and had an oil change. Then he went home to Clisby Avenue and his "old lady" sent him to the store. Shortly after he returned, he left again to go to Traction Avenue to gamble.
On his way to Traction Avenue, he bought some brake fluid. Once he got to Traction Avenue, he parked near a field so he could put the brake fluid in his car. He looked for a wrench in his glove compartment. He didn't find one but he noticed a .22 revolver there so he decided he should remove it to the trunk. Just before he opened the trunk, a car pulled beside him. A man (with a pistol in his hand), got out of the vehicle and said "hold it" (R. 288) or "halt, halt" (R. 290). The appellant replied "You halt." (R. 290).
A woman then got out of the car and came around to the trunk. As the two approached him, the appellant said, "You shoot me, . . . I'm going to shoot her." (R. 288).
The man then placed his gun next to the appellant's head and the appellant grabbed the gun around the cylinder and put it under his arm. The appellant began moving the man (Burks) to the light of a front porch of a house nearby. He told the two he didn't want to shoot anyone and ordered McCord to get back.
Burks was told to drop the gun which he didn't, so the appellant fired his gun in the air so he could get some help. The appellant testified that at this point Burks asked him to "forget about it" (R. 289) but he said no. McCord did say she was going to get help. The appellant said he kept calling someone at the house and yelling that he was being robbed. *Page 62 
The two continued to struggle until the .22 was out of bullets, so the appellant took Burks' gun away and kicked Burks. Burks started toward the tan vehicle and the appellant said he shot for his legs but instead shot him in the back.
The appellant walked up to Burks and at this time, first saw his badge. He dropped Burks' gun and said, "What I did?" (R. 291) and then went to a house down on Traction Avenue.
Once there, he decided to give up because he didn't think he had done anything wrong. He went to the Mayor and gave up.
The appellant testified that he did not know McCord had been shot until he was at headquarters nor did he know that the tan vehicle was a police vehicle. He denied that Burks told him to throw his gun in the ditch and that he was selling marijuana on that day although he did admit to buying and selling drugs on Traction Avenue on other occasions. The appellant claimed he kept the gun only because of the number of robberies that had taken place recently in that area.
 I
The appellant's first contention is that the State's evidence was insufficient to support a conviction because the State failed to prove the appellant had fired intentionally at McCord.
The appellant was indicted for the capital offense of:
 "Murder of any police officer, sheriff, deputy, state trooper, federal law enforcement officer, or any other state or federal peace officer of any kind, or prison or jail guard, while such officer or guard is on duty or because of some official or job-related act or performance of such officer or guard."
Alabama Code § 13A-5-40 (a)(5) (1975). Murder as used in this provision shall be defined by § 13A-6-2 (a)(1), Code of Alabama 1975 which reads as follows:
"(a) A person commits the crime of murder if:
 "(1) With intent to cause the death of another person, he causes the death of that person or of another person; . . ."
Therefore, the two elements of this capital offense are: (1) intent to kill and (2) the person killed was a law enforcement officer.
"Intent may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances."Harjo v. State, 395 So.2d 1104 (Ala.Cr.App. 1981). Furthermore, the commentary following § 13A-6-2, Code of Alabama 1975 states:
 "Where the actor intentionally or knowingly does an act that is highly likely to cause death to another person, and as a natural or direct result another person is killed, though not the person subjectively intended to be killed or seriously injured (e.g., arson of public building, blowing up commercial airplane, shooting gun indiscriminately, etc.), the actor is guilty of murder under either § 13A-6-2 (a)(1) because he intended to `cause the death of another person,' or § 13A-6-2 (a)(2) for recklessly engaging in conduct which creates a grave risk of death and `under circumstances manifesting extreme indifference to human life'". (Emphasis added)
Therefore, to be found guilty of the capital offense defined in § 13A-5-40 (a)(5), it is not necessary that the accused intended to kill the deceased but he must have intended to kill someone or intended to do an act likely to cause the death of some person.
Intent could be implied in this case from the appellant's use of a dangerous weapon. The appellant admitted shooting his own gun numerous times while he and Burks were struggling. "The intentional doing of an act so greatly dangerous to human life may supply all the legal elements of intent, however free the action may be from actual purpose to kill." Gautney v. State,284 Ala. 82, 89, 222 So.2d 175 (1969). See also Sashington v.State, 56 Ala. App. 698, 325 So.2d 205 (1975). *Page 63 
We can also infer intent from the fact that the appellant intentionally shot at and very likely could have killed Burks. The appellant admits he shot Burks and if he did not know McCord had been shot at this time (as he claims), it was very likely McCord could have been shot as well if she were standing nearby. Intent certainly may be implied in the murder of McCord from evidence indicating the appellant intentionally shot at Burks. See Harjo v. State, 395 So.2d 1104 (Ala.Cr.App. 1981).
Moreover, there was testimony from both Burks and the appellant that the appellant did have the intent to shoot McCord. The appellant told Burks if Burks shot at him, he would shoot McCord first.
Since we find that there was sufficient legal evidence contained in the record, from which the jury could, by fair inference, have found the appellant guilty of this capital offense, this court will not disturb the verdict on the grounds of the sufficiency of the evidence. Bender v. Alabama,420 So.2d 843 (Ala.Cr.App. 1982). The appellant's intent was a question for the jury. Sashington v. State, supra.
 II
The trial judge refused to instruct the jury on the lesser included offense of criminally negligent homicide and the appellant claims this was error.
Section 13A-1-9 (b) states:
 "(b) The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."
Therefore, the trial judge could not give a charge on criminally negligent homicide unless the evidence provided somerational basis for doing so.
 "A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. A court or jury may consider statutes or ordinances regulating the defendant's conduct as bearing upon the question of negligence." (Emphasis added).
Alabama Code § 13A-2-2 (4) (1975).
From a review of the evidence in this case, we do not believe there is any rational basis for a criminally negligent homicide verdict. Obviously, there was a substantial and unjustified risk that someone could be shot by the appellant's use of the pistol. The only question before this court is whether the appellant perceived that risk. It can hardly be said that he did not under this record. The appellant pointed his gun at Officer McCord and stated to Burks he intended to shoot her if Burks shot him. He must have known that if he shot his gun that there was a strong possibility that someone could be killed or seriously harmed.
Therefore, the trial judge correctly refused to charge the jury on criminally negligent homicide.
 III
The appellant claims the trial court erred by refusing to give the requested instructions numbers 7, 8, 9 and 11 on the subject of self-defense.
Section 12-16-13, Code of Alabama, 1975 states in part:
 ". . . The refusal of a charge, though a correct statement of the law, shall not be cause for a reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's general charge or in charges given at the request of parties."
See also Hardy v. State, 406 So.2d 442 (Ala.Cr.App. 1981).
We have reviewed the court's oral charge on the subject of self-defense and conclude that "the correct principles of law contained in the refused charge[s] were substantially, *Page 64 
adequately and fairly covered by the trial court's oral charge . . ." Hardy v. State, supra.
Therefore, this issue cannot be a basis for reversal by this court.
 IV
The appellant contends that to be convicted under § 13A-5-40
(a)(5), the offender must have knowledge that the victim was a law enforcement officer and, therefore, the trial judge erred by refusing to charge the jury to that effect.
To effectively construe this provision, we must examine the intent of the legislature when they enacted this and give effect to that intent. State v. Spurlock, 393 So.2d 1052
(Ala.Cr.App. 1981). To discern that intent, we must examine "the particular evils at which the legislature is aimed," and the legislature's "design, motive, [and] purpose" in enacting this statute. McWhorter v. State Board of Registration forProfessional Engineers and Land Surveyors, 359 So.2d 769 (Ala. 1978).
Certainly, the legislature enacted this provision in contemplation of the societal gravity associated with the killing of law enforcement personnel, and to provide an enhanced deterent against these killings and to give to law enforcement officers, a protection greater than the law of homicide provides to private citizens. United States v. Feola,420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).
Police officers risk their lives each day in the noble interest of protecting society and legislatures realize that these persons should be afforded protection commensurate with their responsibilities.
In reading the language of § 13A-5-40 (a)(5), Code of Alabama 1975, there are no words used within that provision to indicate that knowledge is a requirement of the capital offense. The legislature, when it enacted this provision, could have easily required knowledge but in the absence of any such requirement, it is clear to this court that the legislature did not intend to include the element of knowledge.[2] "Penal statutes must be strictly construed and may not be extended by construction."State v. Spurlock, supra.
The legislature clearly intended to exclude knowledge from this provision and this court must give this effect to that intention.
Moreover, even if this court held knowledge to be a requirement of this provision, there was testimony by Burks that both officers revealed they were, in fact, police, and that was sufficient evidence to allow the jury to conclude the appellant had knowledge of the identity of these officers.
 V
The appellant objects to the trial judge's instructions to the jury which he gave following the charge concerning the consequences of the jury in failing to reach a unanimous verdict.
In situations such as the one at issue, judges may, and frequently do, encourage jurors to continue deliberating in the hope that some agreement will be reached. This is never improper as long as the judge does not coerce the jury to reach a verdict or suggest to them a particular verdict. Stricklandv. State, 348 So.2d 1105 (Ala.Cr.App. 1977), Jones v. State,56 Ala. App. 444, 322 So.2d 735 (1975).
The trial judge in this case explained to the jury the desirability and importance of reaching a verdict. He gave an impartial instruction to the effect that each side (the majority and the minority) should consider the views of the other. Never did he give any indication as to which way the verdict should be returned. In fact, he could not have known which way the jury may have been leaning. *Page 65 
We have examined the instructions as a whole, and we do not find the trial judge acted improperly. See Evans v. State,338 So.2d 1033 (Ala.Cr.App. 1976) (similar charge to the one at bar and found not to be improper).
 VI
The appellant contends the trial judge should not be allowed to increase the jury's recommendations of life imprisonment without parole to the death sentence. We cannot agree. §13A-5-47 (e), Code of Alabama, 1975 expressly states:
 "In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweight the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendations of the jury contained in its advisory verdict, unless such a verdict has been waived to section 13A-5-46 (a) or 13A-5-46 (g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court." (Emphasis added).
This provision is a clear expression of what the legislature intended. The jury's decision is labeled a "recommendation" or "advisory verdict" throughout the statute and it is plainly stated that their decision is not binding on the trial judge.
This court has directly addressed this question.
 ". . . [I]t is the trial judge, who at a separate hearing, determines whether or not the defendant is to suffer death or life imprisonment without parole. The verdict of the jury is advisory only. No sentence exists until the pronouncement by the trial judge at the conclusion of the sentence hearing."
Clements v. State, 370 So.2d 708, 714 (Ala.Cr.App. 1978).
The United States Supreme Court has upheld a death sentence imposed by a trial judge even though the jury recommended life imprisonment. See Dobbert v. Florida, 432 U.S. 282,97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
 ". . . [J]ury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."
Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960,49 L.Ed.2d 913 (1976).
We must recognize, however, the rule adopted by the Florida Supreme Court in Tedder v. State, 322 So.2d 908 (1975) and cited in Dobbert v. Florida, supra, which states:
 "In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ. Tedder v. State, 322 So.2d 908, 910 (1975) (emphasis added) (cited with approbation in Proffitt v. Florida, 428 U.S. at 249, 96 S.Ct., at 2965.)
This court does not believe this to be law in the State of Alabama. From an examination of the Dobbert opinion, it does not seem to us that the U.S. Supreme Court intended this rule to be incorporated into each state's death penalty statutes. Our view is that the court was citing approval of this extra protection afforded to a defendant by the Florida Supreme Court. However, the U.S. Supreme Court has approved of the sentencing procedures adopted by the State of Alabama. The Alabama Death Penalty Statute states the jury's recommendation is not binding on the trial judge, and he may impose the death penalty even in light of the jury's recommendation of life imprisonment without parole. Therefore, the trial judge in this case did not act improperly in sentencing the appellant to death. *Page 66 
 VII
This court is required by § 13A-5-53 (a), Code of Alabama 1975, to automatically review the propriety of the death penalty in cases in which that sentence has been imposed. This statute reads in part as follows:
 ". . . This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case."
First of all, this court has examined the record of the sentencing proceedings and we can find no error contained therein which would adversely affect the rights of this appellant.
Secondly, we believe the aggravating and mitigating circumstances set out by the trial judge in his written findings are, in fact, fully supported by the evidence in this case.
Thirdly, in order to conclude that death was the proper sentence in this case, we must determine:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Alabama Code § 13A-5-53 (b), see also Beck v. State,396 So.2d 645 (Ala. 1980).
There is nothing contained in this record that would indicate the trial judge imposed this particular sentence under the influence of passion, prejudice or any other arbitrary factor or was partial in any way.
This court has made an independent examination of the aggravating and mitigating circumstances in this case and has concluded that death is the appropriate sentence for this appellant under this record. One aggravating circumstance existed in this case — "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Alabama Code § 13A-5-49 (5). Officer Burks' testimony (concerning the fact that he was wounded and Officer McCord was killed while they were trying to effectuate an arrest upon the appellant) was sufficient to support a finding of this aggravating circumstance.
The appellant claims that he has no significant history of prior criminal activity and this is a mitigating circumstance. We cannot agree. Several misdemeanor convictions were set out in the pre-sentence report and we deem those convictions sufficient to refute the appellant's claim that he had no significant history of criminal activity. We note that since none of these convictions were felony convictions, the appellant's record cannot be considered an aggravating circumstance.
The appellant also asserted his good character as a mitigating circumstance. The defense put on witnesses who were his fellow workers who testified the appellant was an average worker but did have problems with absenteeism. There was testimony at trial by the appellant and during the sentencing hearing by his common-law wife that he gambled, used marijuana and bought and sold marijuana. We cannot say this evidence proves the appellant was someone of good character, and thus this cannot be considered as a mitigating circumstance.
The determination of whether the aggravating circumstances outweigh the mitigating circumstances and vice versa, is not a numerical one. See Alabama Code § 13A-5-48 (1975). It is based on the gravity of the aggravating circumstances compared to that of the mitigating circumstances. *Page 67 
This court has held that a finding of only one aggravating circumstance is sufficient to support a sentence of death, and we are of the opinion that it is sufficient to sustain the death penalty in this cause. See Keller v. State, 380 So.2d 926
(Ala.Cr.App. 1979).
We have concluded that the death penalty is being imposed on similar defendants in similar cases and therefore the sentence of death is not excessive or disproportionate to this appellant. See Cade v. State, 375 So.2d 802 (Ala.Cr.App.),aff'd, 375 So.2d 828 (Ala. 1979), vacated on unrelated grounds448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980), rev'd onunrelated grounds, 405 So.2d 699 (Ala. 1981).
Therefore, for the reasons stated above, the jury's verdict of "guilty as charged", and the trial judge's sentence of death is due to be and is hereby affirmed.
AFFIRMED.
DeCARLO, P.J., and HARRIS and BOWEN, JJ, concur.
[1] The trial court's sentencing order dated June 18, 1982, is hereto attached and made a part hereof as Appendix A. (Volume 3, R. 475-486).
[2] Federal courts and the United States Supreme Court have also held that knowledge is not a requirement under federal statutes similar to § 13A-5-40 (a)(5). See U.S. v. Feola, 420 U.S. 671,95 S.Ct. 1255, 43 L.Ed. 541 (1975), McNabb v. U.S.,123 F.2d 848 (6th Cir. 1941), rev'd. on unrelated grounds, 318 U.S. 332,63 S.Ct. 608, 87 L.Ed. 819 (1943).
 APPENDIX A CIRCUIT COURT FIFTEENTH JUDICIAL CIRCUIT CC-82-211-G STATE OF ALABAMA, Plaintiff, vs. PAUL EDWARD MURRY, Defendant. SENTENCING ORDER
Paul Edward Murry stands convicted by a jury of his peers of the capital offense of the murder of a City of Montgomery police officer (Mary McCord) in violation of Alabama Code §13A-5-40 [a](5).
In a separate sentencing phase, the same jury returned its advisory verdict that defendant be sentenced to life imprisonment without parole.
On June 11, 1982, the court held the hearing mandated by §13A-5-47. Defendant presented three (3) witnesses and argument was presented by the state and the defendant. Prior thereto, a pre-sentence report was ordered and made a part of the record in this case. Counsel for defendant and the defendant were given ample opportunity to examine the report for inaccuracies, and no part of the pre-sentence report has been, or shall be, kept confidential. Neither counsel for the defendant nor the defendant suggested any corrections in the pre-sentence report. However, counsel for defendant objected to certain matters contained in the report referring to drugs found in a trash can at or near the scene. Counsel is correct that these matters were not brought out in the trial in chief and the court has not considered this matter in arriving at the conclusions stated hereinafter.
The court has considered the pre-sentence report as to the background of defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The court, however, has made its own independent analysis of the existence or non-existence of aggravating and mitigating circumstances. The court has made its own special application of the facts which the court has heard and has carefully reviewed the enumerated aggravating circumstance and mitigating circumstances whether enumerated or not.
At the sentencing hearing, the state's attorney urged the court to reject the recommendation of the jury and fix defendant's punishment at death. Defendant, through counsel, suggested that the recommendation reflected the conscience of the community and should be accepted.
 I SUMMARY OF THE CRIME AND DEFENDANT'S PARTICIPATION
Officer McCord and Officer Tony Burks, both officers of the Montgomery Police Department assigned to the Vice and Narcotics Division, commenced the second shift in the afternoon of January 5, 1982. The first leg of their shift took them to Traction *Page 68 
Avenue.[1] McCord had only recently been assigned to Vice and Narcotics and had been Burks' partner for about two months. Burks was familiarizing McCord with the Traction Avenue area. The pair traveled in a beige unmarked police automobile, however, it appears from the evidence that such automobiles are easily recognized as police vehicles. Burks and McCord were in plain clothes.
Defendant is a 37 year old male who was employed by the City of Montgomery Sanitation Department.[2] Defendant testified in the guilt phase of this case.
Defendant's automobile was parked along the right-of-way of Traction Avenue, a short distance from a residence described as 2256 Traction Avenue. The owners or persons in possession of the residence conducted card and dice games at this house. The front porch light was on, however, defendant was parked out of the illumination.[3] Defendant had gambled at the house on prior occasions.
As the officers slowly proceeded up Traction Avenue at about 6:00 p.m., they passed defendant who was standing by the trunk of his car.[4] As the officers passed, defendant attempted to flag them down and sell them drugs. Officer McCord said to the defendant words to the effect that she could not believe defendant was attempting to sell drugs to the police. She said this either immediately before or at the time she exited the police vehicle. Burks stopped the car and approached the defendant. He heard McCord identify herself as a police officer and tell defendant he was under arrest for either sale or possession of marijuana.[5] At this point, McCord had her weapon drawn and had it trained on defendant and the defendant had his weapon drawn (a .22 caliber pistol) and trained on McCord. Burks drew his weapon and identified himself as a police officer and began maneuvering himself into a position to physically apprehend defendant. Burks grabbed the defendant, but due to the physical size difference, he could not control him. The defendant neutralized Burks' weapon as Burks grabbed defendant's arm, and a scuffle ensued. Defendant fired his pistol several times.[6] One shot entered Burks' right wrist, others were fired randomly and one killed Officer McCord. Defendant and Burks continued the scuffle well off the roadway until defendant gained control of Burks' weapon (a .357 magnum pistol). At this point Burks broke for the police vehicle and defendant shot him once at close range in the right lower back.[7] Burks fell at the rear of *Page 69 
defendant's vehicle and the defendant left and walked to 2256 Traction Avenue.
Shortly, defendant returned to where Burks lay, made some comment and dropped Burks' gun. Defendant went to his sister-in-law's house located at 2268 Traction Avenue. McCord was at the driver's side of the police vehicle partially sitting on the rocker panel with her head resting on her arms on the front seat. McCord was mortally wounded, but alive at this time. Burks crawled to the police vehicle and radioed for help.
Officer Johns and his partner responded to the call. Shortly thereafter, the Mayor of the City of Montgomery arrived. The defendant who was standing not far away surrendered himself to the Mayor.
The defendant was arrested and taken to police headquarters. His automobile was impounded and a legal search of the automobile and its contents was conducted. Defendant's shirt produced a small manila envelope containing marijuana. No drug paraphernalia or other drugs were found in the automobile. II AGGRAVATING AND MITIGATING CIRCUMSTANCES
The aggravating circumstance relied on by the state is that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. Section 13A-5-49 (5).
The state's attorney in argument suggests that by finding the defendant guilty of the capital offense, the jury likewise found the defendant guilty beyond a reasonable doubt of the aggravating circumstance. Such an argument would be availing in most situations since each of the definitions of the capital offense is mirrored by an enumerated aggravating circumstance. To an extent, such is the case sub judice. However, in this case the court not only charged the jury that the state was required to prove beyond a reasonable doubt an intentional killing of Officer McCord without provocation, i.e., murder, the court also charged on manslaughter and self-defense. There was testimony in the case that the police officers never identified themselves as police officers and defendant further testified that he had not offered to sell any drugs to the police officers. The court, therefore, charged the jury that defendant could resist an unlawful arrest, but that he could not use more force than necessary to defend himself against what he reasonably perceived to be imminent, threatened harm.[8]
Under the court's charge and the law, the jury must have found that the homicide was intentional and that there was no provocation inasmuch as the defendant was found guilty of the capital offense. However, *Page 70 
if the jury found that the attempted arrest was illegal because of lack of probable cause or failure of the officers to properly identify themselves, but that the defendant used unreasonable force in resisting the arrest — then, and in that event, a finding of guilty would not ipso facto be a finding beyond a reasonable doubt of the aggravating circumstance. The state presented no additional evidence at the sentencing phase of this case.
In considering what weight to give the jury's recommendation, it is necessary to analyze its basis. There are only two avenues by which a jury could have arrived at its advisory verdict. The jury could have found either 1) that there was no aggravating circumstance, or 2) that the aggravating circumstance was outweighed by the mitigating circumstance or circumstances. State's counsel suggests that the jury failed to properly consider aggravating and mitigating circumstances, i.e., failed to follow the court's instructions in returning its advisory verdict, and therefore, the verdict is entitled to no weight. There is no clear evidence to support this argument and it is not considered.
 A
ASSUMING PROOF OF THE AGGRAVATING CIRCUMSTANCE IS IT OUTWEIGHED BY THE MITIGATING CIRCUMSTANCES WHEN THEY ARE WEIGHED AND WEIGHED AGAINST EACH OTHER
Defendant offered two enumerated mitigating circumstances: 1) the age of the defendant at the time of the crime, and 2) the defendant has no significant history of prior criminal activity. Defendant offered other evidence concerning the defendant's character, and his work record and reputation at his place of employment.
The court does not find the defendant's age (36) at the time of the commission of the offense to be a mitigating circumstance in the case sub judice.
The court finds from the evidence that the defendant is an average worker who has never caused any disruption or trouble while at work.
The court finds by a preponderance of the evidence that the defendant is not a person of good character. The defendant testified that he had previously sold drugs on Traction Avenue, and, defendant's common law wife testified that defendant had dealt drugs.[9] Not only had defendant sold drugs, but he was also a drug user and had used drugs on the job.
The court finds by a preponderance of the evidence that defendant has a significant history of prior criminal activity. The pre-sentence report lists three misdemeanor convictions from the State of New York for criminal possession of dangerous drugs, unlawful entering of a building and criminal trespassing in the first degree. The report also was supplemented to note two misdemeanor convictions in this city which are disorderly conduct and carrying a weapon unlawfully. Moreover, defendant is an admitted user and seller of narcotics in addition to his admitted illegal gambling activities.[10] The defendant also testified that he had smoked marijuana on the day of the homicide.
Assuming the finding of an aggravating circumstance beyond a reasonable doubt from the evidence, the court is of the opinion that the aggravating circumstance outweighed the mitigating circumstance as is more fully set out in the conclusion of this Order.[11] *Page 71 
 IS THERE PROOF OF AN AGGRAVATING CIRCUMSTANCE BEYOND A REASONABLE DOUBT?
It is without much question that at the critical point of inquiry, the defendant was not "in custody." Therefore, the only questions to be resolved are whether there was an attempted lawful arrest by the officers and did defendant kill McCord to avoid or prevent a lawful arrest. The facts detailed in Section I are more than adequate upon which to find beyond a reasonable doubt that the attempted arrest of the defendant was legal. From those facts it is also proved beyond a reasonable doubt that defendant killed McCord to avoid or prevent arrest.
For the purposes of this Order an enumeration of the facts upon which the court finds sufficient to support the legality of the attempted arrest beyond a reasonable doubt are, as follows: 1) that drugs were openly sold on and around Traction Avenue. It is more than reasonable to infer that the officers were aware of this fact. 2) defendant was standing at the rear of his vehicle in an unlit area with small manila envelopes in his hand.[12] 3) defendant verbally offered to sell narcotics [a felony committed in the presence of the officers] to the officers. 4) both officers identified themselves as police officers and told defendant he was under arrest. 5) the police vehicle, though unmarked, is reasonably capable of identification as a police vehicle.
In determining whether the officers had reasonable cause to arrest the defendant, the court considered whether there existed a state of facts or circumstances as would lead a reasonable man of ordinary caution, acting impartially, reasonably, and without prejudice to conscientiously believe the person accused to be guilty. Miller v. State, 53 Ala. App. 213
[298 So.2d 633] ([Ala.] Crim.App. 1974). See also those cases collected in Vol. 3, Alabama Digest, Arrest, Key Nos. 63.4 (1)(2) (3).
Moreover, in examining all the circumstances surrounding the attempted arrest, it must be borne in mind that the officers were not afforded the opportunity to reflect on the totality of the facts as enjoyed by the trial judge in the comfort of chambers or the jury in the deliberation room. On June 5, 1982, events were unfolding rapidly which required the exercise of quick, trained judgment based on the reasonable appearances and the reality of the situation. These events occurred very fast, perhaps no more than two or three minutes elapsed during the entire occurrence, although Burks' testimony describing the events consumed thirty to forty minutes.
Arrests and attempted arrests are not always accomplished with the technical preciseness we would like to believe. The person arrested does not always cooperate, he does not always drop his weapon and submit peaceably. In dealing with these questions of the legality of the arrest, the court must deal with probabilities. Such probabilities are not technical, but factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians would act.United States v. Seay, 432 F.2d 395 (5th Cir. 1970).
 III CONCLUSION
The Death Penalty Act requires this court to make an independent analysis of the facts and apply the law to those facts in reaching its conclusion with regard to sentence.
Under the facts and law of this case, and after due consideration and analysis of all the circumstances and consideration of the aggravating circumstance and mitigating circumstances and weighing them and weighing them against each other, the court concludes and is of the opinion that the aggravating circumstance outweighs the mitigating circumstances. *Page 72 
It would be erroneous to conclude or say that the court has rejected the recommendation of the jury in setting sentence. The recommendation is advisory and is expressly made non-binding on the court. Section 13A-5-47 (e). The advisory verdict is one of the many facts to be considered and weighed and weighed against other facts and circumstances. It is entitled to weight because it is the considered opinion of the majority of the jurors that heard substantially the identical testimony heard by the undersigned.[13]
The court, in conducting the required independent analysis and evaluation of the facts and aggravating and mitigating circumstances has given the advisory verdict solemn deliberation in determining the weight to be attached.[14]
It is, therefore, ORDERED that defendant be sentenced to death.
It is further ORDERED that formal sentencing be held on June 22, 1982, at 9:00 a.m.
DONE and ORDERED in chambers this 18th day of June, 1982.
 /s/ William R. Gordon
WILLIAM R. GORDON Circuit Judge
[1] The testimony unequivocally established that narcotics were peddled from the right-of-way of Traction Avenue and from many of the residences located on the thoroughfare. See the testimony of Mrs. Wiggins — particularly her cross-examination by defendant's counsel.
[2] Defendant was 36 years of age at the time of the offense. The defendant's place of employment is significant inasmuch as the Sanitation Department trucks as well as all police vehicles, marked and unmarked, are fueled at the same city lot.
[3] The significance of this fact is that defendant testified he had parked at this point because 1) it was where he always parked, and 2) defendant testified that he was preparing to put brake fluid in his automobile before commencing the evening's gambling activities. The court, as well as the jury, would be justified in finding it curious that a person would not take advantage of the only source of light to work on the car. Even more curious is the fact that defendant purchased the brake fluid at a service station only a short time before, but did not put the brake fluid in his car at that time.
[4] Defendant maintains that he was at the trunk of the car placing his .22 caliber pistol in it before entering the gambling house. The court cannot accept this testimony that defendant was not going to take the pistol into the house inasmuch as the avowed purpose of carrying the weapon was for protection and to avoid being "ripped off" while in the area.
[5] The court finds from its independent assessment of the evidence that the officers had sufficient probable cause to make such an arrest.
[6] Testimony by the forensic witnesses at trial was that the defendant's weapon contained six spent cartridges. The defendant testified that the day before, for some unexplained reason, he fired one round into the ground outside of his house.
[7] The projectile remains in Burks' body as it is inoperable due to the proximity to his spine.
[8] With regard to provocation, the jury was charged substantially as follows. The law is that the avoiding of an unlawful arrest may or may not constitute sufficient provocation. [Noles vs State, 26 Ala. 31 (Ala. 1855)]. This is a question of fact to be determined by you from the evidence touching on whether the officers identified themselves and all the other evidence surrounding this occurrence.
A police officer may arrest a person without a warrant under these circumstances: a) for any public offense committed in the officer's presence, or b) when he has reasonable cause to believe that the person arrested or attempted to be arrested has committed a felony.
When arresting a person without a warrant, the officer must inform of his authority and the cause of arrest, except when the person is arrested in the actual commission of a public offense. The law of this state is further that the possession, sale, furnishing or giving away of marijuana is a felony and a public offense. [A felony committed in the officer's presence would be a public offense, Preyer vs State, 369 So.2d 901
([Ala.] Crim.App. 1979) (forgery)].
However, even if the arrest be unlawful, the resistance to the arrest cannot be an enormous disproportion to the harm threatened. [Brown vs State, 109 Ala. 70, 20 So. 105 (Ala. 1896)]. This is because one may only use reasonable force to resist an unlawful arrest. If the resistance be in enormous disproportion to the harm threatened, then this would not be provocation recognized by law. A person may not use physical force to resist a lawful arrest by a police officer who is known or reasonably appears to be a police officer. [Section13A-3-28].
* * * * * *
The law on provocation that I gave you in the charge on murder applies to this portion of the charge on manslaughter.
[9] Officer Burks testified that defendant was standing behind the trunk of his car attempting to flag them down with one hand and exhibiting small manila envelopes [marijuana is commonly packaged in small manila envelopes for sale] in his other hand. The defendant specifically testified that he was not standing out there with manila envelopes in his hand that day.
[10] Inasmuch as defendant admitted to use and sale of narcotics, there is no risk that the court has considered unproven charges. Cook vs State, 369 So.2d 1251, 1257 (Ala. 1978).
[11] The state argued that defendant had not interjected the issue of defendant's age as an enumerated mitigating circumstance, and, therefore, it could not have been considered by the jury and should not be considered by the court. Section13A-5-46 (g). In view of the court's finding on this issue, it pretermits addressing this point.
[12] Although defendant denied displaying these envelopes, he did admit that he usually kept his narcotics in the trunk of his car.
[13] The jury was not privy to the information contained in the pre-sentence report or the testimony presented at the sentencing hearing.
Only a majority of the jury need agree to recommend sentence of life imprisonment without parole. Section 13A-5-46 (f).
[14] The court, with all respect to the conclusion reached by Carnes, Alabama's 1981 Capital Punishment Statute, 42 The Ala. Lawyer, 456 at 490 footnote 37, can only categorize the recommendation as a mitigating circumstance given the broad definition of a mitigating circumstance. Section 13A-5-52.
The anomaly is that an advisory verdict of death could not be considered an aggravating circumstance because it is not enumerated.